# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-1726
Filed February 11, 2026

————————————

**In the Interest of G.A. and V.T., Minor Children,**

**Jami J. Hagemeier**,
Guardian ad Litem-Appellant.

————————————

Appeal from the Iowa District Court for Polk County,
The Honorable Brent Pattison, Judge.

————————————

**REVERSED AND REMANDED WITH DIRECTIONS**

————————————

Jami J. Hagemeier of Youth Law Center, Des Moines, appellant attorney
and guardian ad litem for minor children.

Mark D. Reed of Marberry Law Firm, P.C., attorney for appellee father.

Brenna Bird, Attorney General, and Mackenzie L. Moran, Assistant
Attorney General, attorneys for appellee State.

————————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Buller, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

The guardian ad litem (GAL) for two children, born in 2019 and 2020, appeals from the denial of a petition to terminate the father's parental rights. The GAL did not seek to terminate the mother's parental rights, and they are not at issue in this appeal. For the reasons that follow, we reverse and remand with directions to terminate the father's parental rights.

## BACKGROUND FACTS AND PROCEEDINGS

The Iowa Department of Health and Human Services (HHS) investigated the family in this case for child abuse in 2020 after the father yelled at the mother, slammed her onto the bed, and strangled her while the younger child was in the room and the older child was in the next bedroom with half-siblings. The father was eventually arrested and pled guilty to domestic abuse assault by strangulation. Following the father's arrest, the children remained in the mother's custody.

In 2022, HHS became involved with the family again following a severe incident of domestic violence when the mother's paramour assaulted her. The mother and her paramour both had substance-abuse issues. The children remained in the mother's custody as she entered a sober-living facility, but they were later removed after she struggled with her sobriety. The children were returned to the mother's custody in 2024 in light of her sobriety and progress in case expectations.

After the 2020 assault, a no-contact order prohibited contact between the mother and the father but the mother later asked that it be rescinded. From the hindsight of the termination trial, the mother testified that she regretted asking to vacate the no-contact order. She testified that there were other occasions when the father assaulted her, which she did not report to

police. She also said that, through therapy, she recognized that the father emotionally abused her (name-calling, degrading her, etc.) and was controlling and manipulative. And she noted that the father expected her to pay for everything when it came to the children and household finances.

Other than while incarcerated, the father has had some degree of supervised visitation with the children. The juvenile court found that the father's attendance at visits was inconsistent but had improved during "the latter stages of the case."

In late 2024, the parties requested the juvenile court consider closing the case by bridge order. However, by the time a hearing was held, the mother and the GAL no longer supported a bridge order because the father was still only permitted fully supervised visits, had not participated in recommended services, and had violated multiple HHS rules (including driving the children without a license). The court denied the request for a bridge order, finding it would only be "grist for relitigation of issues in district court—rather than a harbinger of safety and stability for the children." The court set the matter for a permanency hearing, observing that a termination petition may be filed before the court took further action.

In December 2024, the children's GAL petitioned to terminate the father's parental rights. Testimony at trial generally established the mother was doing well in her sobriety and successfully providing for the children's needs. One of the children has been diagnosed with autism, which requires parenting with a heightened degree of consistency and predictability. That child attends multiple weekly appointments with a variety of providers for therapy and medical management. The mother attends all the child's appointments; according to her, the father has not even asked about the

appointments. And the father admitted to not asking about the children's services beyond a therapist one child saw more than a year before trial.

The mother testified that the father was not a safe co-parent. She described the father's history of domestic violence, including multiple instances in which he domestically abused her. And she described a pattern of the father violating HHS rules, such as taking the children places HHS had not approved and driving the children without having his license. She also expressed concern about the father's use of medical marijuana and how it might impact the children. She opined that the father was generally unable or unwilling to meet the children's needs, as demonstrated by one of the children acting out after visits. She testified that, if this case were closed by bridge order rather than termination, she believed the father would continue to push boundaries if not outright violate the custodial order. In her view, visits with the father had been very disruptive to the household—particularly for the child with autism, causing violent outbursts and accidents at school. And, in her opinion, the father's continued involvement in her and the children's life was not in their best interests.

According to HHS, the father made statements that he believes he should have equal custody and care of the children. As the juvenile court understood his views, the father attempts to blame the mother and HHS for him not advancing to unsupervised visitation. But the court discredited this attempt to shift the blame, observing that the father's expectations were "very unrealistic" and that he "only played a limited role in the boys' lives" as a consequence of the abuse and resulting incarceration. The court also agreed with the mother's observation that the father had poor insight into the children's needs. And the court singled out as troubling the father's perspective he should only have to pay child support if he gets to see the

4

children more often. For his part, the father emphasized he had completed some services, including domestic abuse programming required following his conviction for domestically abusing the mother. And he said he had started mental-health therapy in late 2024 and completed some substance-abuse treatment while incarcerated. But he admitted to not participating in any after-care for substance abuse since then.

According to court records, the father's criminal history includes driving while barred, interference with official acts, multiple drug crimes, eluding, domestic abuse assault, multiple robbery and theft convictions, and multiple probation and parole violations. As of the termination trial, he was once again on parole. And he admitted at trial that his parole violations were one of the reasons he had missed so many visits with the children.

The father's involvement with the court system also includes termination of his parental rights to two other children in 2016. That case originated in part due to the father's domestic violence against another partner, as well as his substance abuse and a gun being found within reach of the children.

When asked about the domestic violence that gave rise to this case, the father equivocated and evaded questions about his conduct. Initially, he said he shoved the mother. He only admitted he strangled her after he was confronted with the police report's description of the offense—even though he pled guilty to strangling her. He admitted all of this happened in front of the children. And he claimed to have no memory of screaming at the mother and calling her a "bitch" in front of the children. According to an HHS supervisor, the father has never sought out additional domestic-violence treatment or services beyond the minimum mandated by his criminal sentence, despite the department's encouragement.

Although HHS did not petition for termination, a supervisor testified the department's "position is that these children need permanency, either by way of termination or by way of a protective bridge order." The supervisor believed that "either option would be appropriate.[1] She opined that, if a bridge order were entered, it could strictly limit the father's custody, require supervised visits, and have phases for progression. As the juvenile court saw it, the supervisor's opinion that a bridge order may be appropriate "was based more on [the HHS supervisor's] confidence in [the mother] than [the father]'s progress.

In the supervisor's words, she was putting her faith in the mother's "massive protective capacity" as a "sober and safe" caregiver who "goes above and beyond to meet the kids' needs." And she acknowledged that a bridge order could be harmful to the mother's "sobriety, recovery, and mental health" by forcing her into lifelong interactions with the man who domestically abused her. When asked why the department would recommend a custodial outcome that endangered the mother and by extension the children, the HHS supervisor declined to answer in specifics, repeated "the department could go either way" on a bridge order or termination, and punted to the court, saying: "I don't know what the best answer is, and I think that's the point of the court making a decision." On cross-examination, the supervisor agreed that the "severe domestic violence" the father perpetrated against the mother was a "factor in favor of the court entering a termination order."

In its written ruling, the court detailed evidence and arguments on both sides of the termination question. Observing "[t]here are some facts that support a finding that termination is in the children's best interests," the

---

[1] In earlier proceedings, HHS had recommended a bridge order.

court emphasized the father's "significant and very troubling domestic violence" history and that he still did not "recognize how his domestic violence has impacted [the mother] and the boys." Based on this and other evidence, the court mused it was a "reasonable question" whether the father could safely be in the children's lives. The court also credited reports that one of the children's behavior worsened around visits. And the court again documented its subjective concern that the father would use any resulting "bridge order as an opportunity to relitigate custody, put the children in the middle of more conflict, and harass [the mother] rather than a mechanism for retaining his parental rights and keeping some involvement in the boys' lives."

On the other side of the ledger, the court emphasized that perhaps termination was not in the children's best interests because the children were safe in the mother's care and custody options available to the court included strictly limiting the father's visitation. According to the court, this informed HHS's decision not to seek termination, though the court also "ha[d] some doubts about whether [the father] would follow the terms of a custodial order faithfully" given his past criminal convictions and violations of HHS rules. The court also noted and credited HHS testimony that the reason the father had not progressed in visitation was due to "his significant drug use and domestic violence," followed by slow engagement with services, providing very limited support for the children, and only engaging in consistent visits in "the very late stages of the case."

Based on these considerations, the court concluded the GAL proved the statutory grounds for termination but did not carry her burden to prove by clear and convincing evidence that termination was in the children's best interests. In the end, the court found "[t]here are definitely reasons to be

concerned about [the father's] involvement in the boys' lives," but these reasons were "not enough for the court to find [termination of his parental rights] is in their best interests based on the evidence presented in the hearing."

The GAL appeals,[2] urging we reverse and remand with directions to terminate the father's parental rights. Our review is de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

## DISCUSSION

As a preliminary matter, two aspects of the juvenile-court ruling jump out at us. First, we are somewhat concerned that the juvenile court may have engaged in some improper burden-shifting. For example, the court found relevant that "[t]here was also no testimony from any therapist or other service provider about why it would be harmful to [the children for the father] to retain his parental rights with a limited degree of visitation." While the GAL had the burden to prove termination was in the children's best interests, we do not think the GAL was required to put on evidence disproving the appropriateness of a bridge order when the juvenile court itself had already ruled a bridge order was inappropriate.

Second, given that the juvenile court solely resolved this termination on the best-interests prong, we are troubled by the court's conclusion that the father's rights should not be terminated despite observing those rights were "intact only because of [the mother]'s amazing work in Recovery

---

[2] HHS did not file a brief on appeal, which is unfortunate given the department's somewhat complicated (and evolving) position in this case. We note in the interest of completeness that the attorney general appeared on the department's behalf in the juvenile court, rather than the county attorney. *See* Iowa Code § 232.90(3) (2025).

Court" and that, if the mother had "faltered while [the father] was in prison, it is very likely his rights would have been terminated." The court appears to suggest the mother should unfairly carry the burden of regulating the father's future conduct, despite being a victim of his domestic violence. As we have often recognized, one parent's custody "does not impact the [other parent's] rights, as their parental rights do not rise and fall together." *In re J.K.-O.*, No. 24-0678, 2024 WL 3290381, at *1 (Iowa Ct. App. July 3, 2024); *see In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005) (requiring each parent to advance their own facts and reasons "separate and apart from" the other parent's reasons why termination was not in the children's best interests). We think the court's reasoning here carries perverse societal incentives: a domestic-violence victim rising to the occasion of single parenting should not be expected to regulate her abuser's behavior during custodial interactions for the coming decades. Nor should the father get to use the mother's successes as a reason termination of *his* rights isn't in the children's best interests. *See In re G.B.*, No. 22-0439, 2022 WL 1657190, at *1 n.1 ("The father cannot rely on the mother's alleged fitness to parent as a reason his rights should not be terminated."). And our skepticism on this front is also consistent with HHS testimony regarding the mother's potential role in supervising visits.

These two concerns—the potential burden-shifting and the expectation that the mother's successes mean she must essentially regulate the father—may not on their own be sufficient to warrant reversing the juvenile court. But they give us pause, particularly given the recognition at trial that the father would likely seek shared custody before long.

In our review of the record, we are most concerned about the father's failure to address his history of domestic violence. We see a clear pattern of

the father domestically abusing the mothers of his children in the presence of those children. It bodes poorly that the father would not admit the details of his past abuse without them being dragged out of him on cross-examination; he instead attempted yet again to minimize or deny his own wrongdoing. And we agree with the observations of the court and the GAL below that the father has limited if any insight into how domestic violence affected and continues to affect the children. Unlike the juvenile court, we do not find it informative that the father has not committed new acts of domestic violence—he has been incarcerated a substantial period of the juvenile cases' three-year duration, and the mother's address was made confidential precisely to ensure the father could not find and abuse her again. Based on our independent review of the record, the only efforts the father made toward addressing his history of domestic violence was completion of the programming required as a condition of his incarceration.

In addition to the domestic violence, we think the juvenile court failed to account for the father's failure to progress to unsupervised visits. In a case open for three years, any parent making reasonable progress would have progressed to at least some unsupervised visits if not overnights. This father never has. Instead, he has only experienced fully supervised parenting, in sixty- or ninety-minute blocks. And his history of domestic violence, failure to learn the children's unique medical needs, and other concerns spell out good reasons why he never progressed. Our published decisions clearly recognize the failure to progress to unsupervised visits is an important consideration in determining whether a parent can safely resume custody. *See In re L.A.*, 20 N.W.3d 529, 533 (Iowa Ct. App. 2025); *In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024), *abrogated on other grounds by L.A.*, 20 N.W.3d at 534. The inability to safely resume custody necessarily informs the best-interests analysis and weighs heavily in favor of termination.

Third, we are also troubled by the father's repeated violation of HHS rules, such as his attempts to see the children without supervision and driving them without a license. While some of the documented rules-violations could perhaps be described as minor, we think they are part of a broader pattern of the father's refusal to abide by the social contract, in realms of both criminal law and the juvenile-court system. Other evidence also supports this observation, including the mother's description of the father repeatedly making promises to the children that they would get to go to his house or go camping with him, which would have been in contravention of court orders. And even the juvenile court expressed doubt that the father would comply with any future custodial order.

Last, we are struck that, despite the juvenile court repeatedly praising the mother for the improvements she made to her life and her prioritizing the children, the court did not seem to consider the mother's view on the children's best interests. The mother testified that she believed the children's best interests were served by terminating the father's parental rights, and this is what she said when asked why:

> I think that children need consistency. I think that children need [a] parent that's going to help provide for them emotionally and mentally, physically and financially. I think that they need a parent who is healthy and sober and a parent that can do everything that that child needs for them. And I don't believe that [the father] can do those things.

On our de novo review, we agree with these observations by the mother. The children deserve consistency, permanency, and stability. They deserve a safe and sober home. And the father has never provided these things, even after three years of services in juvenile court. We conclude the children's best interests are served by termination of the father's parental rights, and we reverse the juvenile court's ruling to the contrary.

As we read the juvenile court's order, it did not reach any of the exceptions to termination. We require parents to preserve error on these exceptions. *In re J.R.*, 20 N.W.3d 839, 843 (Iowa Ct. App. 2025). And on our review of the record, we find the father did not make any legal argument concerning the exceptions below, nor did he file a written closing argument. To the extent we could invoke these exceptions on our own motion, we have independently reviewed the record and determine no exception should thwart termination.

We similarly observe the father did not request additional time below. He does not request additional time on appeal either. We conclude any additional-time argument is waived and unpreserved. And again, even if we had authority to award additional time sua sponte, we would not do so here: the father has had three years to make meaningful progress toward resuming custody of these children, and there is no reason to think an additional six months would have a different outcome.

## DISPOSITION

We reverse and remand with directions for the juvenile court to enter an order terminating the father's parental rights.

**REVERSED AND REMANDED WITH DIRECTIONS.**